**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE BOSTON SCIENTIFIC DATA BREACH LITIGATION**<br><br>This Document Relates to: All Actions | Case No. 1:26-cv-14017-JEK<br><br>**DEMAND FOR JURY TRIAL** |

# CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Alexei Dickinson, Anthony Maniscalco, and Joseph Mesi, II, and Brian Scott (collectively "Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this class action Complaint against Defendant Boston Scientific Corporation ("BSC" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a global medical-device manufacturer that develops minimally invasive technologies.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "Private Information"—about its current and former employees and clients' patients. But Defendant lost control over that

[1] *About Boston Scientific*, BOSTON SCIENTIFIC, https://www.bostonscientific.com/en-US/about-us.html (last visited Aug. 28, 2026).

data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' and clients' patients' Private Information.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees and clients' patients on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiffs are Data Breach victims, and they bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

7. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former employees' and clients' patients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8. Plaintiff Alexei Dickinson is a natural person and a citizen of Minneapolis, Minnesota where he intends to remain.

9. Plaintiff Anthony Maniscalco is a natural person and a citizen of Dayton, Ohio where he intends to remain.

10. Plaintiff Joseph Mesi, II is a natural person and a citizen of Buffalo, New York where he intends to remain.

11. Plaintiff Brian Scott is a natural person and a citizen of Bondsville, Massachusetts, where he intends to remain.

12. Defendant Boston Scientific Corporation is a corporation incorporated in Delaware, with its principal place of business at 300 Boston Scientific Way, Marlborough, Massachusetts.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs and Defendant are citizens of different states. And there are over 100 putative Class Members.

14. This Court has personal jurisdiction over Defendant because it is headquartered in Massachusetts, regularly conducts business and has sufficient minimum contacts in Massachusetts.

15. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### *BSC Collected and Stored the PII of Plaintiffs and the Class*

16. BSC is a global medical-device manufacturer that develops minimally invasive technologies.[2]

[2] *About Boston Scientific*, BOSTON SCIENTIFIC, https://www.bostonscientific.com/en-US/about-us.html (last visited Aug. 28, 2026).

17. BSC operates in 127 countries with 59,000 employees worldwide and a revenue of $20 billion in 2025.[3]

18. As part of its business, BSC receives and maintains the Private Information of thousands of its current and former employees and clients' patients.

19. In collecting and maintaining the Private Information, BSC agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their Private Information.

20. Under state and federal law, businesses like BSC have duties to protect their current and former employees' and clients' patients' Private Information and to notify them about breaches.

21. BSC recognizes these duties, declaring in its "Privacy Policy" that:

a. "We take the security of personal data seriously. We maintain reasonable administrative, technical and physical safeguards to protect the personal data we collect and store from loss, misuse, destruction, or unauthorized access."[4]

b. "To ensure your personal data will still be processed in compliance with our policies and applicable law, BSC uses contractual and technical safeguards as appropriate based on the nature of the personal data and local requirements."[5]

---

[3] *Id.*

[4] *Boston Scientific Privacy Notice*, BOSTON SCIENTIFIC, https://www.bostonscientific.com/en-US/privacy-policy.html (last visited Aug. 28, 2026).

[5] *Id.*

***BSC's Data Breach***

22. On or between May 7 and May 12, 2026, BSC was hacked in the Data Breach.[6]

23. Worryingly, Defendant already admitted that it "became aware of potential unauthorized access to company data on May 12, 2026" and that its "investigation determined that the unauthorized parties gained access to certain cloud-based IT business applications through social engineering (vishing) tactics and downloaded data between May 7 and May 12, 2026."[7]

24. Because of BSC's Data Breach, at least the following types of Private Information may have been compromised:

a. Name;

b. Contact information;

c. Date of birth;

d. Social Security number;

e. Driver's license number;

f. Health information; and

g. Financial information.[8]

25. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in BSC's custody and control. And upon information and belief, the putative Class is over one hundred members—as it includes its current and former employees and clients' patients.

---

[6] *Notice of data incident*, BOSTON SCIENTIFIC, https://www.bostonscientific.com/en-US/security-update.html (last visited Nov. 16, 2026).

[7] *Id.*

[8] *See id.* Upon information and belief, this is a non-exhaustive list of the Private Information compromised in the Data Breach.

26. And yet, upon information and belief, BSC has yet to send individualized notice letters to victims of the Data Breach.

27. Thus, BSC continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

28. BSC failed its duties when its inadequate security practices caused the Data Breach. In other words, BSC's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information. And thus, BSC caused widespread injury and monetary damages.

29. Since the Data Breach, BSC claims it "activated [its] incident response protocols and began an investigation with the assistance of third-party cybersecurity experts."[9]

30. But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' Private Information will be protected from additional exposure in a subsequent data breach.

31. Further, the BSC's announcement about the Data Breach shows that BSC cannot—or will not—determine the full scope of the Data Breach, as BSC has been unable to determine precisely what information was stolen and when.

32. Upon information and belief, BSC has done little to remedy its Data Breach or to compensate Plaintiffs and Class Members for the injuries that BSC inflicted upon them.

33. Because of BSC's Data Breach, the sensitive Private Information of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

---

[9] *Id.*

34. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[10]

35. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully accessed data.

36. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[11]

37. Thus, on information and belief, Plaintiffs' and the Class's stolen Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiffs' Experiences and Injuries***

*Plaintiff Alexei Dickinson*

38. Plaintiff Alexei Dickinson is a former employee of Defendant.

39. Thus, Defendant obtained and maintained Plaintiff's Private Information, including his social security number, tax information, address, banking information, email address and phone number.

40. As a result, Plaintiff was injured by Defendant's Data Breach.

---

[10] John Krebs, *The dark web: What your business needs to know*, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

[11] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

41. Plaintiff is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

42. As a condition of his employment with Defendant, Plaintiff provided Defendant with his Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that Private Information in order to obtain employment and payment for that employment.

43. Plaintiff provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues/continue to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

44. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of Private Information.

45. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

46. On information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

47. Through its Data Breach, Defendant compromised Plaintiff's Private Information.

48. Plaintiff Dickinson has *already* suffered from identity theft and fraud through multiple attempts to access his bank account.

49. For one, on October 8, 2026, Plaintiff Dickinson's bank notified him of multiple attempted logins to his account from a foreign IP address. After one succeeded, Plaintiff's bank investigated and assisted him in opening a new account. Plaintiff estimates that he spent approximately three hours addressing the incident. He also had to provide his new account information to his employers for direct-deposit and payroll purposes.

50. Upon information and belief, these instances of fraud are a direct result of Defendant's Data Breach. Plaintiff Dickinson had previously provided the compromised financial information to Defendant.

51. Indeed, Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

52. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages, and phone calls.

53. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

54. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

55. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

56. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

57. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's Private Information right in the hands of criminals.

58. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

59. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Anthony Maniscalco*

60. Plaintiff Anthony Maniscalco is a former employee of Defendant.

61. Thus, Defendant obtained and maintained Plaintiff Maniscalco's Private Information, including his name, address, date of birth, Social Security number, driver's license number, phone number and insurance information.

62. As a result, Plaintiff Maniscalco was injured by Defendant's Data Breach.

63. Plaintiff Maniscalco is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

64. As a condition of his employment with Defendant, Plaintiff Maniscalco provided Defendant with his Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff Maniscalco, including payroll, and required Plaintiff Maniscalco to provide that Private Information in order to obtain employment and payment for that employment.

65. Plaintiff Maniscalco provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Maniscalco's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

66. Plaintiff Maniscalco reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of Private Information.

67. Plaintiff Maniscalco does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

68. On information and belief, Plaintiff Maniscalco's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

69. Through its Data Breach, Defendant compromised Plaintiff Maniscalco's Private Information.

70. Plaintiff Maniscalco has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

71. And in the aftermath of the Data Breach, Plaintiff Maniscalco suffered from a spike in spam text messages and phone calls on the telephone number he provided to Defendant.

72. Plaintiff Maniscalco fears for his personal financial security and worries about what information was exposed in the Data Breach.

73. Because of Defendant's Data Breach, Plaintiff Maniscalco has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go

far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Maniscalco's injuries are precisely the type of injuries that the law contemplates and addresses.

74. Plaintiff Maniscalco suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

75. Plaintiff Maniscalco suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

76. Plaintiff Maniscalco suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Maniscalco's Private Information right in the hands of criminals.

77. Because of the Data Breach, Plaintiff Maniscalco anticipates spending considerable amounts of time and money to try to mitigate his injuries.

78. Today, Plaintiff Maniscalco has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Joseph Mesi, II*

79. Plaintiff Joseph Mesi, II is a former employee of Defendant.

80. Thus, Defendant obtained and maintained Plaintiff Mesi, II's Private Information, including his name, address, date of birth, Social Security number, driver's license number, financial account information, phone number, and insurance information.

81. As a result, Plaintiff Mesi, II was injured by Defendant's Data Breach.

82. Plaintiff Mesi, II is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe

manner. He is careful to store any documents containing his Private Information in a secure location.

83. As a condition of his employment with Defendant, Plaintiff Mesi, II provided Defendant with his Private Information. Defendant used that Private Information to facilitate its employment of Plaintiff Mesi, II, including payroll, and required Plaintiff Mesi, II to provide that Private Information in order to obtain employment and payment for that employment.

84. Plaintiff Mesi, II provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Mesi, II's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

85. Plaintiff Mesi, II reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of Private Information.

86. Plaintiff Mesi, II does not recall ever learning that his information was compromised in a data breach incident—other than the Data Breach at issue here.

87. On information and belief, Plaintiff Mesi, II's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

88. Through its Data Breach, Defendant compromised Plaintiff Mesi, II's Private Information.

89. Plaintiff Mesi, II has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

90. And in the aftermath of the Data Breach, Plaintiff Mesi, II suffered from a spike in spam phone calls on the telephone number he provided to Defendant.

91. Plaintiff Mesi, II fears for his personal financial security and worries about what information was exposed in the Data Breach.

92. Because of Defendant's Data Breach, Plaintiff Mesi, II has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Mesi, II's injuries are precisely the type of injuries that the law contemplates and addresses.

93. Plaintiff Mesi, II suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

94. Plaintiff Mesi, II suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

95. Plaintiff Mesi, II suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Mesi, II's Private Information right in the hands of criminals.

96. Because of the Data Breach, Plaintiff Mesi, II anticipates spending considerable amounts of time and money to try to mitigate his injuries.

97. Today, Plaintiff Mesi, II has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Brian Scott*

98. Plaintiff Brian Scott is an adult individual and, at all relevant times herein, a resident and citizen of Bondsville, Massachusetts, and a victim of the Data Breach.

99. Defendant obtained and maintained Plaintiff's Private Information as a result of his dealings with Defendant, including his name, address, date of birth, Social Security number, driver's license number, financial account information, phone number, and insurance information.

100. As a result, Plaintiff Scott was injured by Defendant's Data Breach.

101. Plaintiff Scott is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

102. Plaintiff Scott provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

103. Plaintiff Scott reasonably understood that a portion of the funds derived from services rendered would be used by Defendant to pay for adequate cybersecurity and protection of Private Information.

104. Plaintiff was unaware of the Data Breach until learning about it through publicly available information.

105. Through its Data Breach, Defendant compromised Plaintiff Scott's Private Information.

106. On information and belief, Plaintiff Scott's Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

107. As a result, Plaintiff was injured in the form of lost time dealing with the consequences of the Data Breach, which included and continues to include: time spent verifying the legitimacy and impact of the Data Breach; time spent exploring credit monitoring and identity theft insurance options; time spent self-monitoring their accounts with heightened scrutiny and time spent seeking legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach.

108. Plaintiff was also injured by the material risk to future harm they suffer based on Defendant's breach; this risk is imminent and substantial because Plaintiff's data has been exposed in the breach, the data involved, including Social Security numbers, is highly sensitive and presents a high risk of identity theft or fraud; and it is likely, given Defendant's clientele, that some of the Class's information that has been exposed has already been misused.

109. Plaintiff suffered actual injury in the form of damages to and diminution in the value of their Private Information—a condition of intangible property that they entrusted to Defendant, which was compromised in and as a result of the Data Breach.

110. Plaintiff, as a result of the Data Breach, has increased anxiety for their loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling their Private Information.

111. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information, in combination with their name, being placed in the hands of unauthorized third parties/criminals.

112. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Consumers Prioritize Data Security***

113. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[12] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[13]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[14]

c. 89% of consumers stated that "I care about data privacy."[15]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[16]

---

[12] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[13] *Id.* at 3.
[14] *Id.*
[15] *Id.* at 9.
[16] *Id.*

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[17]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[18]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

114. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

---

[17] *Id.*

[18] *Id.* at 11.

h. continued risk to their Private Information—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

***Substantially Increased Risk of Identity Theft and Fraud***

115. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

116. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

117. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

118. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

119. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[19] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web

[19] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[20] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

120. The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

121. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

122. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

123. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that

---

[20] *Id.*

person."[21] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[22]

124. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

125. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[23]

126. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

127. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[21] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[22] *Id.*
[23] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

128. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

129. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[24]

130. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[25] These

---

[24] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

131. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

132. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[26]

133. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

134. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

135. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

---

[26] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

136. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

137. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

138. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[27]

139. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[28]

140. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[29]

141. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[27] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[28] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[29] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sept. 11, 2023).

***Defendant Could Have Prevented the Data Breach***

142. Data breaches are preventable.[30] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[31]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[32]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…[a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [33]

***Defendant Failed to Follow FTC Guidelines***

143. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

---

[30] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).
[31] *Id.* at 17.
[32] *Id.* at 28.
[33] *Id.*

144. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[34] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

145. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

146. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

147. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

---

[34] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

148. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' and clients' patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

149. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: (i) educating all employees; (ii) strong passwords; (iii) multi-layer security, including firewalls, anti-virus, and anti- malware software; (iv) encryption (making data unreadable without a key); (v) multi-factor authentication; (vi) backup data; and (vii) limiting which employees can access sensitive data.

150. Other industry standard best practices include: (i) installing appropriate malware detection software; (ii) monitoring and limiting the network ports; (iii) protecting web browsers and email management systems; (iv) setting up network systems such as firewalls, switches, and routers; (v) monitoring and protection of physical security systems; (vi) protection against any possible communication system; and (vii) training staff regarding critical points.

151. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

152. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Violated HIPAA***

153. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[35]

154. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[36]

155. The Data Breach resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

[35] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[36] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

156. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

157. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose Private Information was compromised in the Data Breach discovered by Boston Scientific Corporation in May 2026.

158. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

159. Plaintiffs reserve the right to amend the class definition.

160. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

161. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

162. <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

163. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

164. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

165. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing Private Information;

d. if Defendant breached contract promises to safeguard Plaintiffs and the Class's Private Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

166. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

167. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

168. Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

169. Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

170. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information was wrongfully disclosed.

171. Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' Private Information.

172. Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

173. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required

and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

174. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

175. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

176. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

177. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

178. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

179. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant hold vast amounts of Private

Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

180. Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

181. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

182. Defendant breached these duties as evidenced by the Data Breach.

183. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

184. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members, which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

185. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

186. Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

187. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

188. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

189. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## <u>SECOND CAUSE OF ACTION</u>
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

190. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

191. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

192. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive Private Information.

193. Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

194. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

195. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

196. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

197. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members

of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

198. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

199. Defendants violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

200. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se* under the law of the states where Plaintiffs reside.

201. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

202. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

203. Plaintiffs and Class Members either directly contracted with Defendant or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendant.

204. Plaintiffs and Class Members or their third-party beneficiaries were required to provide their Private Information to Defendant as a condition of receiving employment provided by Defendant. Plaintiffs and Class Members provided their Private Information to Defendant in exchange for Defendant's employment.

205. The contracts entered into by Plaintiffs' and Class Members' agents (for example, their employers), were made for the direct benefit of Plaintiffs and the Class. Specifically, Plaintiffs' and Class Members' third-party agents entered into contracts with Defendant to obtain insurance for Plaintiffs and Class Members.

206. Plaintiffs and Class Members or their third-party beneficiaries reasonably understood that a portion of the funds they derived from their labor or funds they paid would be used to pay for adequate cybersecurity measures.

207. Plaintiffs and Class Members or their third-party beneficiaries reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

208. Plaintiffs and the Class Members or their third-party beneficiaries accepted Defendant's offers by disclosing their Private Information to Defendant in exchange for employment.

209. In turn, and through internal policies, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

210. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's Private Information.

211. Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members or their third-party beneficiaries with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

212. After all, Plaintiffs and Class Members or their third-party beneficiaries would not have entrusted their Private Information to Defendant in the absence of such an agreement with Defendant.

213. Plaintiffs and the Class or their third-party beneficiaries fully performed their obligations under the implied contracts with Defendant.

214. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

215. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

216. Defendant materially breached the contracts it entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

217. In these and other ways, Defendant violated its duty of good faith and fair dealing.

218. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

219. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

220. Plaintiffs and Class Members or their third-party beneficiaries performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

221. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

222. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

223. Defendant owed a duty to its current and former employees and clients' patients, including Plaintiffs and the Class, to keep this information confidential, but it failed to safeguard the Private Information in its systems.

224. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

225. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected

from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

226. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

227. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

228. Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

229. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

230. As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

231. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

232. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information are still maintained by Defendant with their inadequate cybersecurity system and policies.

233. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiffs and the Class.

234. In addition to injunctive relief, Plaintiffs, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

235. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

236. This claim is pleaded in the alternative to the breach of implied contract claim.

237. Plaintiffs and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their Private Information to facilitate employment, and (2) using their labor to derive profit.

238. Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

239. Plaintiffs and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

240. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

241. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

242. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) Private Information and (2) employment because Defendant failed to adequately protect their Private Information.

243. Plaintiffs and Class Members have no adequate remedy at law.

244. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

245. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

246. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

247. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

248. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breach of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

249. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

250. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

251. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

252. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

253. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Date: November 17, 2026

Respectfully submitted,

By: */s/ Raina C. Borrelli*

Raina C. Borrelli (*Pro Hac Vice*)
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Casondra Turner (MA Bar No. 687682)
**MILBERG, PLLC**
260 Peachtree Street, NW, Suite 2200
Atlanta, GA 30303
Tel: (771) 772-3086
cturner@milberg.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
klaukaitis@laukaitislaw.com
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 559-6072

**Pro hac vice forthcoming*

*Attorneys for Plaintiffs and Proposed Class*

**CERTIFICATE OF SERVICE**

I, Raina C. Borrelli, hereby certify that on November 17, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, via the ECF system.

DATED this 17th day of November, 2026.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*

Raina C. Borrelli
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com